IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| **SEALED AIR CORP.** **Plaintiff,** v. **WATER.IO LTD.** **Defendant.** | **COMPLAINT** **JURY TRIAL DEMANDED** |

Plaintiff Sealed Air Corp. ("SEE" or "Plaintiff") brings this Complaint for violation of North Carolina General Statutes §§ 75 *et seq.* against Defendant Water.io Ltd., d/b/a/ WaterIO Ltd., d/b/a ImpacX.IO Ltd., d/b/a ImpacX.IL Ltd., all holding Israeli Company No. 515272789 ("WaterIO" or "Defendant"), and alleges as follows:

## PARTIES

1. SEE is a corporation organized and existing under the laws of the State of Delaware having a principal place of business at 2415 Cascade Pointe Blvd., Charlotte, NC 28208.

2. On information and belief, Defendant is a corporation organized under the laws of Israel having a principal place of business at 2 Bergman St. (Entrance A), 2nd fl. Rehovot, Park Hamada 7670503, Israel.

## JURISDICTION AND VENUE

3. As part of an Agreement between the parties (as defined below), the parties agreed that personal jurisdiction and venue were proper in this Court. Further, Venue is proper pursuant to 28 U.S.C. § 1391(a) – (c).

4. The Court has subject matter jurisdiction of this action pursuant to 28 § U.S.C. 1332(a)(1) because there is complete diversity of citizenship between SEE and Defendant and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

5. Defendant has submitted to the exclusive jurisdiction of this Court and has waived any objections to personal jurisdiction and venue here.

## FACTUAL BACKGROUND

### *The Parties*

6. Plaintiff SEE is an industry leading packaging corporation that creates innovative packaging solutions for a wide array of consumer needs.

7. On information and belief, Defendant WaterIO is a producer of water bottles with sensors that can transmit data to a mobile app.

8. In May of 2018, representatives of SEE first met with vendors from WaterIO, at which the parties discussed adding a sensor device to vacuum insulation panels ("VIP"). VIPs are gas-tight enclosures with a rigid core, from which air has been evacuated. These are often used in insulated shipping containers to provide better insulation performance.

9. On July 15, 2018, SEE and WaterIO entered into a Confidential Information Disclosure Agreement, so the parties could discuss WaterIO building prototypes that meet SEE's temperature assurance monitor specifications.

10. Between July 15 and December 10, 2018, the parties negotiated a development contract, and WaterIO represented that it could produce sensors that satisfy SEE's temperature assurance monitor specifications.

11. On information and belief, WaterIO was aware during this time that it did not have the capabilities to make sensors that would meet SEE's specifications.

2

12. On information and belief, WaterIO used its relationship with SEE deceptively and nefariously as leverage to bolster its own business for purposes of artificially inflating its value during a purported initial public offering ("IPO").

### *The Agreement Between SEE and WaterIO*

13. As part of its plan to increase its company value, WaterIO duped SEE into entering an agreement and several amendments related to the development and supply of certain sensors.

14. On December 10, 2018, SEE and WaterIO entered into a Purchase Agreement (the "Agreement") for a three-phase development contract in which WaterIO would develop SMART VIP sensors. The first phase consisted of developing 100 Smart VIP sensor prototypes. The second phase was for testing and validating these prototypes in SEE's products and manufacturing environment. The third and final phase was expected to be the production phase in which SEE would buy production-ready Smart VIP sensors manufactured by WaterIO. This third and final phase was set to begin only after successful testing in the second phase.

15. The Agreement included a payment schedule in which SEE would pay WaterIO initially for development costs, as well as at the completion of each phase.

16. On December 10, 2019, the parties amended the Agreement (the "First Amendment") to include, among other things, milestones that required WaterIO's completion of 30,000 fully functional Smart VIP Sensors to SEE no later than June 30, 2020. This amendment further included for the first time an addendum estimating the costs that SEE would pay for redesigning the prototype sensors for mass production.

17. On information and belief, WaterIO was aware prior to December 10, 2019, that it could not meet the milestones set forth in this First Amendment.

18. On June 3, 2020, the parties amended the Agreement a second time (the "Second Amendment") to include, in part, a precise technical specification for the Smart VIP sensors and a minimum purchasing requirement for SEE valued at millions of dollars, subject (among other things) to the inspection and approval of the Smart VIP sensors by SEE. The Second Amendment did not amend or eliminate the milestone requirements set forth in the First Amendment.

19. On information and belief, WaterIO was aware prior to June 3, 2020, that it could not consistently produce sensors that would meet the specifications outlined in this second amendment to the Agreement.

20. SEE currently has paid over $300,000 in relation to the terms of the Agreement and the subsequent amendments, including products purchased from third-party vendors, as part of its failed attempts to acquire Smart VIP sensors from WaterIO.

*WaterIO Fails to Create and Cannot Manufacture the Promised Sensors*

21. The Agreement required WaterIO to complete delivery of the Smart VIP sensors by June 30, 2020. WaterIO failed to do so. Indeed, SEE did not begin receiving delivery of the expected 30,000 initial Smart VIP sensors until December 31, 2020, well after the June 30, 2020 milestone date. SEE received the final shipment of these initial sensors on February 12, 2021.

22. The products delivered to SEE did not meet the specifications and were, and are, wholly unusable by SEE. On information and belief, WaterIO knew that the products it delivered did not meet the specifications and were, and are, wholly unusable by SEE.

23. On information and belief, WaterIO did not, and never did, intend to deliver products that met the specifications. Instead, WaterIO intended to string along SEE for as long as possible so that they could use their purported relationship with SEE to artificially inflate the value of their companies for purposes of making an IPO.

4

24. Mr. Kobi Bentkovski, the CEO of WaterIO, emailed SEE on February 10, 2021, informing it that WaterIO planned to make an IPO and requested permission to identify SEE as one of its major customers. On information and belief, WaterIO intended to use its contract with SEE for its personal benefit as a purported (albeit knowingly false) endorsement of WaterIO by SEE, to bolster the appearance of WaterIO's capabilities in order, thereby, to improve the results of WaterIO's anticipated IPO.

25. On or about March 15, 2021, Kevothermal LLC, an affiliate of SEE, informed Mr. Bentkovski that a number of WaterIO's Smart VIP sensors did not meet the required specifications.

26. WaterIO and SEE exchanged emails from April 28-30, 2021, during which time WaterIO's Mr. Bentkovski acknowledged the defective sensors and reiterated WaterIO's commitment to make sensors that would consistently meet the required specifications. In recognition of WaterIO's defective sensors, Mr. Bentkovski offered to delay payment from SEE until after SEE was comfortable that the Smart VIP sensors consistently met SEE's specifications and needs.

27. It eventually became clear that WaterIO lacked the know-how, facilities, or other capabilities to develop, manufacture and supply the Smart VIP sensors. Even worse, it also became clear that WaterIO's capabilities and results (or lack thereof) would not improve to an acceptable level. This ostensibly was known to WaterIO, which knowledge was withheld and misrepresented by WaterIO in an effort to deceive SEE into proceeding under an agreement that WaterIO knew it could not meet, all for the benefit of WaterIO's anticipated IPO.

*WaterIO's Urgent Need for SEE's IPO Endorsement Builds*

28. During the time that SEE was attempting to resolve the defects in the Smart VIP sensors, WaterIO continued to pressure SEE to allow WaterIO to disclose SEE as a customer that

had a material impact on its company in its IPO. SEE never agreed to endorse WaterIO or its products in WaterIO's anticipated IPO.

29. On May 5, 2021, a SEE representative emailed Mr. Bentovski to inform WaterIO that the proposed IPO disclosures regarding SEE's status as a committed customer were inaccurate, as purchase commitments had not been triggered yet due to WaterIO's failure to complete its obligations to timely deliver Smart VIP sensors that conformed to the requirements of the Agreement. From this point, WaterIO became increasingly hostile toward SEE in its efforts to coerce SEE into accepting unacceptable products or otherwise provide some form of endorsement to be used by WaterIO to bolster its anticipated IPO.

30. While the parties had previously worked together to discuss progress and solutions for producing the Smart VIP sensors, WaterIO unilaterally stopped attending these meetings once it became clear that SEE did not intend at that time to endorse WaterIO's IPO.

31. Sometime thereafter, on or about May 14, 2021, SEE and WaterIO had a call, in which Mr. Bentkovski incorrectly and falsely asserted numerous times that SEE's minimum purchase agreements had triggered under the Agreement. WaterIO also claimed against all logic that it (WaterIO) somehow had incurred damages because SEE's refusal, as a customer, to endorse WaterIO allegedly had inhibited WaterIO from moving forward with its IPO.

32. On or about May 17, 2021, WaterIO incorrectly contended that SEE could no longer reject the defective sensors under the Agreement. Moreover, WaterIO overtly threatened litigation if the parties could not renegotiate an agreement wherein SEE was required to pay millions of dollars for the defective sensors. Defying belief, this demand would even have SEE pay WaterIO millions of dollars for sensors that failed quality control and were worthless to SEE.

6

Case 3:24-cv-00663-MOC-DCK   Document 1   Filed 07/18/24   Page 6 of 12

33. SEE sent a letter to Mr. Bentkovski on or about May 26, 2021, informing WaterIO that it had breached the Agreement materially by failing to meet the required milestones and failing to provide production-ready sensors that met the technical specifications in the Agreement. As per the Agreement, this letter provided WaterIO with thirty (30) days to cure its failures.

34. Also on or about May 26, 2021, WaterIO sent a letter to SEE alleging that the sensors were not defective. And again, WaterIO incorrectly reiterated that it believed SEE could no longer refuse the defective products. WaterIO also threatened SEE with litigation in this letter.

35. SEE continued its efforts to resolve the situation regarding the defective sensors. The parties resumed weekly meetings with a call on or about June 2, 2021, as part of SEE's attempt to have WaterIO cure the material defects in its sensors. Due to WaterIO's overt threats of litigation, SEE insisted that counsel for all parties be present on that call. WaterIO proposed a number of inadequate solutions on the call that would not yield consistently production-ready sensors per the Agreement.

36. Counsel for WaterIO sent a letter directly to SEE's counsel on or about the next day on June 3, 2021, alleging that WaterIO's sensors were not defective, and offering the same inadequate remedies discussed on the June 2 call. This letter again reiterated WaterIO's incorrect assertion that SEE could no longer reject WaterIO's defective sensors under the Agreement. Indeed, WaterIO then went so far as to assert a preposterous and unsupported theory, contending that SEE's legitimate concerns were part of some nefarious scheme to sabotage WaterIO's IPO, when in fact it was just the opposite in that WaterIO was trying to use SEE as a ruse in their desired IPO.

### *SEE's Good Faith and WaterIO's Bad Faith*

37. During the Agreement's cure period, SEE continued to attempt work with WaterIO to find a solution to cure the material defects in WaterIO's products. However, on information and belief, WaterIO was unwilling to continue working with SEE after WaterIO missed its IPO filing deadline.

38. Despite SEE's efforts to help cure WaterIO's failures, WaterIO consistently and repeatedly failed to have key personnel attend weekly calls, stopped altogether attending weekly calls that had been put in place to try to resolve the issues, and refused to work with SEE to cure WaterIO's material defects beyond reiterating its inadequate solutions that had already been shown not to cure the material defects.

39. WaterIO's counsel also continued to allege that SEE was attempting to sabotage WaterIO and the Agreement.

40. SEE continued its efforts to resolve the situation amicably, but WaterIO continued its ongoing unfair and deceptive trade practices, including but not limited to making false statements in commerce intended to threaten and disparage SEE and intentionally obstructing SEE's efforts to develop, produce and provide sensors to be used in vacuum insulation panels.

41. On or about June 25, 2021, SEE sent a letter to Mr. Bentkovski indicating its willingness to continue working with WaterIO in a good faith attempt to remedy the situation.

42. Sometime afterward, on or about June 27, 2021, WaterIO's counsel sent a letter directly to SEE's counsel rejecting SEE's offer. WaterIO's counsel also stated that the Agreement had been terminated as of June 25, 2021, and again threatened litigation if SEE would not resume payments for the defective sensors and service fees.

43. SEE continued its good faith efforts to test the Smart VIP sensors, and it notified Mr. Bentkovski in an August 2, 2021 letter that, upon further testing, the majority of the Smart VIP sensors had failed to meet the specifications under the Agreement and its amendments.

44. WaterIO's counsel again sent a letter directly to SEE's counsel alleging that the Agreement had already been terminated in June 2021, and rejecting any attempts by SEE to continue working with WaterIO to remedy the situation.

### *WaterIO's Unfair and Deceptive Trade Practices Against SEE*

45. On information and belief, WaterIO sought to use its contract with SEE to leverage a more favorable IPO for WaterIO, unrelated to the agreement with SEE, despite being aware that it would be unable to adequately perform its obligations under the Agreement.

46. On information and belief, WaterIO's unfair and deceptive behavior was amplified once WaterIO missed its IPO deadline.

47. On information and belief, WaterIO switched from trying to dupe SEE into continuing the parties' relationship, with all of the false promises made by WaterIO and the attendant costs and burdens placed on SEE as a result, to trying to use noncompliance and threats of litigation to force SEE to pay millions of dollars for defective products.

48. On information and belief, WaterIO was aware before commencement of the parties' negotiations to enter into the Agreement, throughout negotiations related to the Agreement, and through the term of the Agreement that it could not make sensors that met the technical specifications in the Agreement and its amendments.

49. On information and belief, WaterIO was aware before commencement of the parties' negotiations to enter into the Agreement, throughout negotiations related to the

Agreement, and through the term of the Agreement that it could not reach the milestones set forth in the Agreement and its amendments.

50. On information and belief, WaterIO was aware before commencement of the parties' negotiations to enter into the Agreement, throughout negotiations related to the Agreement, and through the term of the Agreement that it could not provide adequate remedies to the material defects in its sensors identified by SEE.

51. WaterIO never informed SEE, either before their relationship began or at any time thereafter, that WaterIO could not make sensors that met the technical specifications in the Agreement and its amendments, could not reach the milestones set forth in the Agreement and its amendments, or could not provide adequate remedies to the material defects in its sensors identified by SEE.

52. On information and belief, WaterIO acted unfairly and deceptively in promising SEE technology that WaterIO could not hope to produce in order to unilaterally benefit from the contract and its association with SEE.

53. Once WaterIO's nefarious plan backfired, SEE was threatened, disparaged, and abruptly kicked to the proverbial curb, and today has no usable products despite spending many hours of time and hundreds of thousands of dollars of money during the course of its relationship with WaterIO.

## COUNT I
### (Unfair and Deceptive Trade Practices – N.C. Gen. Stat. § 75-1.1 *et seq.*)

54. The allegations in the preceding paragraphs are incorporated herein by reference.

55. Defendant's acts as alleged herein have been willful, reckless, wanton, egregious, unfair, unethical, deceptive, and unscrupulous.

56. Defendant's conduct, which is in or affecting commerce, constitutes unfair methods of competition and/or unfair and deceptive acts or practices, within the meaning of North Carolina General Statute § 75-1.1 and North Carolina common law. While the parties herein are also parties to a contract, this Complaint, and the Claims asserted herein are **not** directed to any claim for breach of contract. Rather, the claims are directed to the unscrupulous, unfair, egregious, deceptive and willful behavior of Defendant in commerce as described and set forth above.

57. Plaintiff has been damaged by Defendant's conduct and is entitled to monetary and injunctive relief pursuant to North Carolina General Statutes §§ 75 *et seq.* and other applicable law, such relief includes an award of monetary damages, including the amount of the actual losses caused to Plaintiff by Defendant's unfair competition, lost profits, disgorgement of the unfair gains and other unjust enrichment benefiting Defendant, attorneys' fees and costs pursuant to North Carolina General Statutes § 75-16.1, and treble damages pursuant to North Carolina General Statutes § 75-16, together with any and all amounts to be shown at trial.

### PRAYER FOR RELIEF

In view of the foregoing, Plaintiff asks that this Court grant the following relief:

A. Find that Defendant has committed unfair and deceptive acts in violation of North Carolina law;

B. Award all damages and available relief to Plaintiff for Defendant's unlawful acts;

C. Award Plaintiff treble damages pursuant to N.C. Gen. Stat. § 75-16;

D.  Award Plaintiff its costs and attorney's fees pursuant to N.C. Gen. Stat. § 75-16.1;

E.  Award Plaintiff prejudgment and post-judgment interest on all amounts awarded; and

F.  Award Plaintiff such other and further relief as the Court deems just and proper.

SEE hereby demands a trial by jury of all issues in this action so triable.

Respectfully submitted,

Dated: July 18, 2024

s/ J. Mark Wilson
J. Mark Wilson
N.C. State Bar No. 25763
Bruce J. Rose
N.C. State Bar No. 20105
MOORE & VAN ALLEN PLLC
100 North Tryon Street, Suite 4700
Charlotte, North Carolina 28202
Telephone (704) 331-1000
Facsimile (704) 339-5981
Email: markwilson@mvalaw.com
brucerose@mvalaw.com